# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RUSSELL D. JAYME, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 06 C 3963 |
| v. ) | |
| ) | Judge John W. Darrah |
| ITT CORPORATION a/k/a ITT BELL & GOSSETT, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Russell D. Jayme, filed suit against Defendant, ITT Corporation, alleging age discrimination and retaliation. Presently before the Court is ITT's Motion for Summary Judgment.

## BACKGROUND

Jayme was born November 17, 1934. On August 25, 1997, ITT hired Jayme as a Material Mover in the Shipping Department of ITT's Morton Grove facility. ITT is a global engineering and manufacturing company. One of ITT's business segments is fluid technology, which supplies pumps, systems and services to move, control, and treat water and other fluids. At ITT's Morton Grove Facility, ITT assembles various types and sizes of pumps and products for the heating, ventilation, air-conditioning, and cooling ("HVAC") industry. Jayme was 62 years old at the time he was hired. In the Material Mover position, Jayme was primarily responsible for transporting items between storage areas and the Shipping Department. (Def.'s 56.1(a)(3) Statement ¶¶ 1, 4). The working environment at the Morton Grove facility is industrial – various types of motorized vehicles and high-speed machinery are operated in the same areas of the facility where employees work and move around. Because of the dangers inherent in the nature of the work performed, safety is emphasized and is the subject of training. (Id., ¶ 3). Currently there are 746 employees at the

Morton Grove facility, working three shifts in various departments. Approximately 460 of these employees are represented by UAW Local 890 (the "Union"). (Id., ¶ 2).

The terms and conditions of employment of the bargaining unit employees at ITT's Morton Grove facility are governed by a collective bargaining agreement ("CBA") between ITT and the Union. The most recent CBA is effective from August 13, 2005 through August 14, 2010. (Def.'s 56.1(a)(3) Statement ¶ 5). The CBA includes an article entitled "Seniority," which addresses, *inter alia*, layoff and recall rights of bargaining unit employees. Seniority refers to the employee's length of service with ITT. (Id., ¶ 6). The CBA provides that employees whose jobs are eliminated have the option, seniority permitting, of bumping junior employees (employees with less seniority) from certain positions. In those circumstances, the employee whose job is eliminated is given his "bumping rights" via a "bump sheet," which identifies the jobs into which he may bump. The employee is notified of his bumping rights and presented with a bump sheet at a meeting with the Manager of Labor Relations and two Union representatives. (Id., ¶ 7). Bumping can have a domino effect in the bargaining unit. For example, if Employee A's job is eliminated, he may bump Employee B, who, in turn, may bump Employee C, and so on. (Id., ¶ 8).

The CBA also contains an article entitled "Job Posting," which addresses the manner in which open positions are filled. The article provides that when a bargaining unit job becomes available, the opening will be posted, plant-wide, for forty-eight hours. Employees desiring consideration for the available job may sign a bid sheet on the posting. (Def.'s 56.1(a)(3) Statement ¶ 9). With the exception of a period of time in December 2005, ITT and the Union have permitted only active employees to bid on open positions. Employees who are inactive due to layoff status have not been eligible to bid on open positions. (Id., ¶ 10).

ITT has Safety Rules and Regulations for the Morton Grove Facility. The Safety Rules provide, in relevant part, that tools and equipment must not be used in a manner that endangers the safety of employees or ITT property. (Def.'s 56.1(a)(3) Statement ¶ 11). If an ITT employee causes an accident while operating machinery, the employee is required to undergo an evaluation with ITT's Environmental Safety and Health Manager to assess the employee's ability to safely operate the equipment. (Id., ¶ 12).

On April 27, 1998, Jayme successfully bid and was transferred to a Drill Press Operator position. Jayme's responsibilities in this position included drilling and cleaning pump parts. (Def.'s 56.1(a)(3) Statement ¶ 13). On October 21, 2001, Jayme was bumped out of the Drill Press Operator position and, after given his bumping rights, chose to bump into a Warehouse Attendant position. In this position, Jayme's responsibilities included opening boxes of parts and delivering the parts to the Assembly Department. (Id., ¶ 14).

On October 7, 2002, Jayme successfully bid and transferred to another Drill Press Operator position. (Def.'s 56.1(a)(3) Statement ¶ 15). On March 17, 2003, Jayme's Drill Press Operator position was eliminated. After being given his bumper rights, Jayme bumped into a Medium Assembler position. In this position, Jayme assembled pump parts and other small machinery and packed pump parts for shipment. (Id., ¶ 16). All of the positions Jayme held were in the bargaining unit represented by the Union. (Id., ¶ 17).

In February 2005, ITT announced that it would be closing down its motor manufacturing and small-valve assembly operations at the Morton Grove facility. (Def.'s 56.1(a)(3) Statement ¶ 17). In the Fall of 2005, ITT outsourced the motor manufacturing and some of the small-valve assembly work. As a result, the jobs of over fifty bargaining unit employees were eliminated. (Id., ¶ 19).

Many of the employees who faced layoff due to the elimination of their positions chose to bump into positions held by other employees with less seniority. The ensuing sequence of bumping caused a domino effect and led to many employees' changing positions and departments. As a result of the October 2005 layoff, more than eighty employees bumped into different positions or were laid off. (Id., ¶ 20). Some employees who were designated for layoff, and who did not or could not bump into other positions, were allowed to remain in their last position for a period of weeks so that managers would not be left with too many new or inexperienced employees in their departments. (Id., ¶ 21).

As a result of the layoffs and resulting bumping, Jayme was bumped out of his Medium Assembler position by an employee with more seniority. (Def.'s 56.1(a)(3) Statement ¶ 22). On October 13, 2005, ITT's Manager of Labor Relations, Tom Reardon, and two Union representatives met with Jayme to provide him his bumping rights. During this meeting, Reardon gave Jayme a bump sheet that identified his bumping options as Assembler Large Valve/Split Case (2nd Shift), Cell Associate A (3rd Shift), Warehouse Attendant (2nd Shift), and Material Mover (3rd Shift). Jayme chose to bump into the Assembler Large Valve/Split Case position. (Id., ¶ 23). In this position, Jayme was responsible for assembling large pumps that could weigh up to 500 pounds. The position is physically rigorous, requiring employees to move heavy pump components and exert a lot of strength to tighten large nuts over an eight-hour period. (Id., ¶ 24).

On October 17, 2005, Jayme started training for the position. Employees in training for this position are expected to demonstrate a proficiency of at least 80 percent. (Def.'s 56.1(a)(3) Statement ¶ 25). During his training period, Jayme was unable to achieve a proficiency rate of 80 percent. Jayme's proficiency rate was 48.31 percent. (Id., ¶ 26). On October 28, 2005, Jayme attended a meeting with Reardon, Ralph Emerson (Jayme's supervisor), and Union representative

Bill Jozefowski. During this meeting, Reardon informed Jayme that if he was unable to achieve the required proficiency over the next five days, he would be laid off. (Id., ¶ 27). After this meeting, Jayme met with ITT's Director of Human Resources, Bill Dempsey, and asked Dempsey if he could give him another job. According to Jayme, Dempsey told Jayme he would be laid off and that he was eligible for retirement. (Id., ¶ 28). At this time, Jayme was 71 years old and was eligible for retirement under ITT's hourly employee retirement plan. (Id., ¶ 29). On November 4, 2005, Jayme met with Reardon and Union representatives Mae Hodges and Jozefowski, at which time Reardon notified Jayme that he would be laid off. Jayme signed a waiver form, acknowledging that he would be laid off. Jayme had not achieved the 80 percent efficiency rating required for his then position. (Id., ¶ 30). Jayme was laid off effective November 4, 2005. (Id., ¶ 31). At this time, ITT's workforce was comprised primarily of employees over the age of fifty. (Id., ¶ 58).

In December 2005, ITT and the Union decided, on a temporary basis, to permit laid-off employees to bid on open positions even though the practice had been to restrict bidding to active employees. The reason for temporarily opening bidding rights to employees on layoff was that some of the employees designated for layoff after the outsourcing of the motor manufacturing work were still actively working in their last jobs. ITT and the Union determined that all employees designated for layoff (both those on layoff and those who were kept in their last positions temporarily to ensure that departments were staffed with experienced employees) should be treated the same – allowed to bid on open positions. (Def.'s 56.1(a)(3) Statement ¶ 32). That same month, Reardon called Jayme at his home and notified him of three position postings in the warehouse, including an opening for a Material Mover position in the Shipping Department. Jayme asked Reardon to include his name on the bid sheet for all three positions. On January 6, 2006, Jayme was awarded the Material Mover

position, which reported to Shipping Supervisor Russel Thomas. Employees with more seniority than Jayme were the successful bidders on the other two positions. (Id., ¶ 33). Since the time that Jayme last held the Material Mover position, in 1997 and 1998, the position had changed in that it now involved the use of a computer scanner. The computer scanner informs the Material Mover which items need to be removed from the shelves and shipped and records the items that are actually removed from the shelves. Material Movers must scroll to the proper screens on the scanner and are required to scan the label on each part to be shipped. (Id., ¶ 34).

On January 9, 2006, Jayme started training for the Material Mover position. Brenda Ball, another Material Mover, was Jayme's trainer. (Def.'s 56.1(a)(3) Statement ¶ 35). Material Movers in training are required to demonstrate proficiency in using the computer scanner and in operating a motorized pallet dolly and motorized pallet stacker. (Id., ¶ 36). The motorized pallet dolly is a forklift-type vehicle that the Material Mover operates from a rear platform. The pallet dolly is used to pick up pallets of goods and move them around the warehouse. The motorized pallet stacker is another forklift-type vehicle that is operated from a rear platform. The pallet stacker is used to store and retrieve items from overhead racks that rise more than twenty feet in the air. (Id., ¶ 37). Jayme had difficulty operating the computerized scanner during his training. (Id., ¶ 38).

On January 10, 2006, during his training period, Jayme attempted to pick up a pallet with a pallet dolly. The pallet slid and collided with a shrink wrap machine, causing the machine's cover to come off. (Def.'s 56.1(a)(3) Statement ¶ 39). On January 13, 2006, Bell completed a Skills Training Log. The comments section of the Skills Training Log stated:

> You are struggling with the basic concepts of logging off/on and moving from screen to screen. You were confused with the staging locations and stocking locations. Several times you had to be

> reminded about your labels and pallet labels. You didn't pay attention to the screen (twice) when it said "Get pallet label/packing lists." At this stage of training you should be able to do these functions without supervision and you can't at this time. Your productivity is very low . . . . Hit strechwrap machine.

Jayme signed the Skills Training Log next to areas in which he was evaluated. (Id., ¶ 40).

On January 16, 2006, ITT's Environmental Safety and Health Manager, John Fogel, evaluated Jayme's performance in operating the motorized pallet dolly and pallet stacker. Fogel concluded, with regard to the pallet dolly, that "Mr. Jayme had enough skill level to be marginal with the 208 truck. At higher speed or production it would be expected that his judgment [sic] would get worse." With regard to the pallet stacker truck, Fogel concluded "Mr. Jayme had below average and acceptable skill level to be able to continue to use the stacker truck safely without further practice. At higher speed or production it would be expected that his judgment [sic] would get worse." (Id., ¶ 41).

Based on Bell's assessment of Jayme's performance, the collision with the shrink-wrap machine, and Fogel's evaluation, Reardon and Dempsey decided that Jayme could not continue in the Material Mover position because of his poor performance and lack of improvement and because he posed a danger to himself and others in the warehouse. (Def.'s 56.1(a)(3) Statement ¶ 42). On January 17, 2006, Reardon met with Jayme and Union representatives Hodges and Bill Mabe. Reardon informed Jayme that he was being removed from the Material Mover position and that he would be laid off. Jayme insisted that he should be allowed to continue the training and stated that not being allowed to finish the 15-day training period was a violation of the CBA. Reardon denied Jayme's request. The Union representative did not say anything and agreed with Reardon. Jayme signed a paper, acknowledging that he had been laid off. (Id., ¶ 43).

In late April 2006, a bargaining unit Janitor position became available because the incumbent in the position was going on a leave of absence that was expected to last eight weeks. After discussing the position with the Union, Dempsey decided to offer the temporary position to Jayme. (Def.'s 56.1(a)(3) Statement ¶ 44). On April 27, 2006, Dempsey called Jayme at his home and offered him the Janitor position. Jayme told Dempsey that he did not like the position because it was temporary. Jayme also told Dempsey that he did not want to come back to ITT because he had been "unjustly treated." Dempsey asked Jayme if he was quitting, and Jayme responded "Yes." Dempsey confirmed Jayme's resignation by letter dated April 27, 2006. (Id., ¶ 45). Neither Jayme nor the Union filed a grievance over Jayme's layoffs or any of the alleged treatment of him. (Id., ¶ 46).

ITT sent Jayme a form letter, advising him of his retirement options on March 31, 1999; November 29, 2005; and May 4, 2006. Each of these retirement letters sent to Jayme were a form letter that ITT sends to retirement-eligible employees to provide them with information about retirement options. (Def.'s 56.1(a)(3) Statement ¶¶ 47-49.

Wali Mohammed was born January 1, 1955. Mohammed was hired by ITT in January 1997 as a Medium Assembler. During the layoffs in the Fall of 2005, Mohammed was bumped from his Medium Assembler position into a Assembler Large Pump and Valve position. In December 2007, Mohammed successfully bid on and transferred to a Medium Assembler position. Mohammed had more seniority than Jayme. (Def.'s 56.1(a)(3) Statement ¶ 51).

Lucas Mejia was born on July 27, 1975. Mejia was hired by ITT in February 2000 as a Material Mover. During the layoffs in the Fall of 2005, Mejia was bumped from his Material Mover position and, subsequently, laid off because he had no bumping opportunities. In March 2006, ITT

recalled Mejia to a temporary Material Mover position. In May 2006, Mejia was again laid off. (Def.'s 56.1(a)(3) Statement ¶ 52).

Dora Mendez was born on May 18, 1958. ITT hired Mendez in April 2000 as a Medium Assembler. During the layoffs of the Fall of 2005, Mendez was bumped from her position and, subsequently, laid off because she had no bumping opportunities. In June 2006, ITT recalled Mendez to a Janitor position. (Def.'s 56.1(a)(3) Statement ¶ 52).

Alicja Sobusiak was born on April 7, 1956. ITT hired Sobusiak in January 1998 as a Light Assembler. During the layoffs of the Fall of 2005, Sobusiak was bumped from her position and, subsequently, bumped into a Warehouse Attendant position. In April/May 2006, Sobusiak bid on, and received, a Medium Assembler position. (Def.'s 56.1(a)(3) Statement ¶ 54).

Dick Rigor was born on February 24, 1998. ITT hired Rigor in September 1999 as a Material Mover. During the layoffs of the Fall of 2005, Rigor was bumped from his position and, subsequently, laid off because he had no bumping opportunities. In March 2006, ITT recalled Rigor to a temporary Material Mover position. (Def.'s 56.1(a)(3) Statement ¶ 55).

Juanito Juarez was born on February 14, 1998. ITT hired Juarez in August 1999 as a Material Mover. During the layoffs of the Fall of 2005, Juarez was bumped from his position and, subsequently, laid off because he had no bumping opportunities. In May 2006, ITT recalled Juarez to a Material Mover position. (Def.'s 56.1(a)(3) Statement ¶ 56).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323

(1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

A plaintiff alleging age discrimination can avoid summary judgment using either the "direct method" or "indirect method." *Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004) (*Gusewelle*). Under the direct method of proof, a plaintiff may show, either by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by the impermissible purpose of age. Direct evidence is evidence that proves discriminatory conduct by the employer without reliance on inference or presumption. *See Gusewelle*, 374 F.3d at 574.

Circumstantial evidence is evidence sufficient to create a convincing mosaic that allows a fact-finder to infer intentional discrimination by the decision-maker. *See Gusewelle*, 374 F.3d at 574. Such circumstantial evidence must "point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Store, Inc.*, 324 F.3d 935, 939 (7th Cir. 2004) (*Adams*). Three types of circumstantial evidence relevant to discrimination cases have been identified. *See Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994) (*Troupe*). The first is "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn."

The key consideration is the totality of these "pieces of evidence[,] none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe*, 20 F.3d at 737. The second type is "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Troupe*, 20 F.3d at 726. Third is "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 726.

Under the indirect method of proof, from the familiar *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. To do this, a plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) a similarly situated employee not in the protected class was treated more favorably. *See Steinhauer v. Degolier*, 359 F.3d 481, 484 (7th Cir. 2004) (*Steinhauer*). If the plaintiff meets this burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant can do so, the burden shifts back to the plaintiff to show that the defendant's proffered reason for its actions is a pretext for discrimination. *See Steinhauer*, 359 F.3d at 484.

Jayme argues that certain circumstantial evidence is sufficient to permit a fact-finder to infer intentional discrimination by ITT. This circumstantial evidence includes: (1) Dempsey's statement in October 2005 that Jayme was eligible for retirement, (2) Jayme had previously worked successfully in other positions at ITT, (3) he did not receive the full fifteen days of training for

the position of Material Mover in January 2006, (4) he was denied the right to bump other employees for a different position, and (5) he was not offered the Medium Assembler position in April 27, 2006.

Jayme has failed to demonstrate direct evidence of discrimination based on the above circumstantial evidence. In October 2005, Dempsey informed Jayme that he was eligible for retirement. This single statement, which was accurate and consistent with the usual information shared with employees that were eligible for retirement, does not rise to an inference of age discrimination. *See Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997) (infrequent suggestions that plaintiff retire do not alone rise to an inference of age discrimination).

Jayme's layoffs correlated with the ongoing reduction in force and Jayme's inability to perform the positions of Assembler Large Valve/Split Case and Material Mover (as the position existed in 2006). Jayme stresses his previous abilities in other positions and the Material Mover position before it had changed. However, the Court looks at an employee's performance at the time of the alleged adverse employment action, not the employee's previous performance in a different position. *See Peters v. Rennaisance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002). It is undisputed that Jayme was unable to perform the Assembler Large Valve/Split Case position to the required proficiency in October 2005. In addition, Jayme was not performing the Material Mover position satisfactorily; and it was determined that his continued training in that position posed a danger to himself and other ITT employees. Jayme argues that he should have been given more time to train but offers no evidence that ITT allowed younger employees who were not performing their position satisfactorily and who posed a safety risk to continue training.

Jayme also argues that he should have been able to bump into other positions in October 2005 and January 2006. The CBA provided that an employee could bump into another position if their position was "eliminated" by a reduction of force and their position was eliminated or the employee was bumped from their position by a more senior employee. Neither the Assembler Large Valve/Split Case nor the Material Mover positions were *eliminated* in October 2005 and January 2006, respectively. Instead, in October 2005, Jayme voluntarily told ITT that he could not perform the Assembler Large Valve/Split Case position; and in January 2006, it was determined that Jayme could not satisfactorily and safely perform the Material Mover position. The Court will not second guess an employer's decision, regardless of whether it is correct in its belief, if an employer acted in good faith and with honest belief. *See Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997).

Lastly, Jayme argues that he should have been offered the Medium Assembler position on April 27, 2006. However, at that time, Jayme was not on active status at ITT. Jayme had resigned that same day and was on layoff status before his resignation. Because Jayme was not on active status when the position was posted, Jayme was not eligible to bid on the position.

As to the third type of circumstantial evidence, Jayme claims that the circumstantial evidence discussed above also demonstrates that ITT's reasons for laying him off and not offering him the Medium Assembler position were a mere pretext for discrimination.

A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a

mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

As discussed above, the decision to lay off Jayme was his inability to perform the positions in a satisfactory or safe manner. There is no dispute that Jayme was not performing the positions satisfactorily. Furthermore, Jayme was not eligible to bump other employees because his positions had not been eliminated; and he was not eligible to bid on other positions because he was not on active status. Jayme has failed to demonstrate that ITT's decisions were a pretext to discrimination, and the evidence is decidedly to the contrary.

Jayme's failure to demonstrate that a genuine issue of material fact exists as to whether ITT's reasons for his layoffs and failure to offer him other positions were a pretext for discrimination also prevents Jayme from prevailing on his discrimination claim under the indirect method of proof. *See Steinhauer*, 359 F.3d at 484.

Based on the above, Jayme has failed to demonstrate a genuine issue of material fact exists as to his age discrimination claim.

### Retaliation Claim

An employee may present either direct or indirect evidence of retaliation. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007) (*Humphries*). Under the direct

---

[1]The above analysis also demonstrates that Jayme has failed to demonstrate a genuine issue of material fact as to whether Jayme was qualified for the position and whether a similarly situated employee not in the protected class was treated more favorable and further prevents Jayme from prevailing on his discrimination claim under the indirect method of proof.

14

method, a plaintiff must show: (1) that he engaged in a statutorily protected activity, (2) he was subjected to an adverse employment action, and (3) there is a causal connection between the two events. *See Humphries*, 474 F.3d at 404. Under the indirect method, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite meeting his employer's legitimate job expectations, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Tomanovich v. City of Indianapolis*, 457 F.3d 657, 663 (7th Cir. 2006).

Jayme argues that he engaged in a statutorily protected activity when he complained of age discrimination to the Director of Human Resources on October 28, 2005. Jayme cites to page 75 of his deposition in support of his argument. However, page 75 does not include any testimony that Jayme complained of age discrimination to anyone at ITT. To the contrary, Jayme testified in his deposition that he was not alleging retaliation. Accordingly, Jayme has failed to demonstrate a genuine issue of material fact exists that he engaged in a statutorily protected activity. Similarly, Jayme has failed to demonstrate a genuine issue of material fact that a causal connection exists between any statutorily protected activity and an adverse employment action. Furthermore, as discussed above, Jayme has failed to demonstrate that a genuine issue of material fact exists whether ITT's proffered reasons for his layoffs were a pretext for retaliation.

Based on the above, Jayme has failed to demonstrate a genuine issue of material fact exists as to his retaliation claim.

## CONCLUSION

For the reasons stated above, ITT's Motion for Summary Judgment is granted.

Dated: June 21, 2007

JOHN W. DARRAH
United States District Court Judge

16